PHILLIP A. TALBERT
United States Attorney
STEVEN TENNYSON
Assistant United States Attorney
Eastern District of California
501 I Street, Suite 10-100
Sacramento, CA 95814
Phone: (916) 554-2700

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>v.<br><br>JOAN RUBINGER,<br><br>              Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

The United States brings this action to hold Joan Rubinger ("Rubinger") accountable for writing illegitimate prescriptions in violation of the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("Controlled Substances Act" or "CSA"), and alleges as follows:

**<u>INTRODUCTION</u>**

1.     The CSA grants medical practitioners the authority to prescribe controlled substances, but that authority is not limitless—it is conditioned on a fundamental responsibility: prescriptions must be written for a legitimate medical purpose within the usual course of professional practice.

2.     Rubinger, a nurse practitioner, repeatedly violated that obligation by selling illegitimate prescriptions. She provided price lists to her customers, inviting them to select dangerous, highly addictive medications as if they were ordering from a menu. In response to her invitations, Rubinger's customers picked drugs off the list, paid Rubinger upfront, and received illegitimate prescriptions in exchange. These interactions took place through perfunctory text-message exchanges that were devoid of medical discussion. There were no physical exams, no diagnostic tests, no medical records, and no

COMPLAINT

indications of legitimate medical care—just cash for drugs.

3.    To obscure her illegitimate prescribing, Rubinger wrote sham prescriptions in false names, knowing the drugs would be diverted to others. She wrote sham prescriptions to her employees and then instructed them to mail those drugs to others. She also wrote sham prescriptions in the names of her customers' friends and associates, so that her customers could misappropriate these drugs. By spreading opioid prescriptions across multiple sham patient names, Rubinger obscured the excessive quantities that she dispensed to each customer, allowing her to evade systematic safeguards against diversion and abuse. Rubinger's use of sham patients and prescriptions was a drug diversion scheme, not a legitimate medical practice.

4.    As Rubinger explained in her rules of practice, she took steps to conceal her misconduct, coaching each new customer on the "specific processes [she] put in place to make sure each patient appears as a legitimate medical patient." She explained, "I put these rules in place for a reason: to minimize the attention we attract from the DEA." As long as customers followed the rules and paid in advance, Rubinger issued prescriptions, regardless of medical legitimacy. As she explained to new patients, Rubinger's operation was like a fast-food business: "just like at McDonalds, you gotta pay for your burger before they hand it to you."

## PARTIES, JURISDICTION, AND VENUE

5.    Plaintiff is the United States of America.

6.    Defendant Joan Rubinger is a Family Nurse Practitioner, registered with the Drug Enforcement Administration ("DEA") under two different numbers: MM3336422 at 2488 N. California Street, Stockton, California 95204 (under the care of Dr. R.W.); and MR5666106 at 900 3rd Avenue, Room 1402, New York, New York 10022. Rubinger's California DEA registration has been active since 2014.

7.    The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 1355(a), and 21 U.S.C. § 842(c)(1) and § 843(f)(2).

8.    The Court has personal jurisdiction over Rubinger because she transacted business in and committed many of the wrongful acts alleged herein in the Eastern District of California.

9.    Venue is proper in this district under 28 U.S.C. § 1395(a) and 21 U.S.C. § 843(f) because

COMPLAINT

1    many of the alleged acts giving rise to the United States' claims occurred within the Eastern District of

2    California.

3                                    **LEGAL BACKGROUND**

4            10.     Congress enacted the CSA to combat the diversion and abuse of dangerous drugs. It

5    places a critical responsibility on prescribers, who are trusted to serve as conscientious gatekeepers to

6    controlled substances and who are required to issue prescriptions only for legitimate medical purposes.

7    21 C.F.R. § 1306.04(a).

8            **A.    The CSA's Scheduling System**

9            11.     Under the CSA, a drug is considered a "controlled substance" when it is added to one of

10   five schedules, based on several factors, including whether the drug has a currently accepted medical use

11   to treat patients, its abuse potential, and its likelihood to cause dependence if abused.

12           12.     Schedule I drugs are those deemed not to have an accepted medical use. The remaining

13   schedules—Schedules II through V—have legitimate medical purposes and, in the case of Schedules II

14   through IV, generally require a prescription.

15           13.     Schedule II lists controlled substances that have "a high potential for abuse," and that, if

16   abused, "may lead to severe psychological or physical dependence," but that nonetheless have "a

17   currently accepted medical use in treatment in the United States or a currently accepted medical use with

18   severe restrictions." 21 U.S.C. § 812(b)(2).

19           14.     Oxycodone, for instance, is listed on Schedule II, which means it has a high potential for

20   abuse and if misused, may lead to severe dependency. *See* 21 C.F.R. § 1308.12.

21           15.     Schedule III lists controlled substances that have "a potential for abuse less than the drugs

22   or other substances in schedules I and II," and that, if abused, "may lead to moderate or low physical

23   dependence or high psychological dependence," but that nonetheless have "a currently accepted medical

24   use in treatment in the United States." 21 U.S.C. § 812(b)(3). Schedule III includes testosterone and

25   anabolic steroids, which can be abused in an attempt to promote muscle growth and enhance athletic

26   performance. *See* 21 C.F.R. § 1308.13.

27           16.     Schedule IV lists controlled substances that have "a low potential for abuse relative to the

28   drugs or other substances in schedule III," and that, if abused, "may lead to limited physical dependence

or psychological dependence relative to the drugs or other substances in schedule III," but that nonetheless have "a currently accepted medical use in treatment in the United States." 21 U.S.C. § 812(b)(4). Schedule IV includes alprazolam (commonly sold under the brand name Xanax), diazepam (commonly sold under the brand name Valium), and lorazepam (commonly sold under the brand name Ativan). *See* 21 C.F.R. § 1308.14. Each of these three drugs belongs to a class of medications called benzodiazepines, which are central nervous system depressants. These drugs are often abused along with opioids, and those two classes of drugs taken in combination are associated with an elevated risk of life-threatening overdose.

17.   Schedule V lists controlled substances that have "a low potential for abuse relative to the drugs or other substances in schedule IV," and that, if abused, "may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in schedule IV," but that nonetheless have "a currently accepted medical use in treatment in the United States." 21 U.S.C. § 812(b)(5). Schedule V includes certain dosages of promethazine-codeine. *See* 21 C.F.R. § 1308.15.

**B.   Medical Practitioners Must Comply with the CSA**

18.   The CSA sets forth strict rules with which medical practitioners must comply in prescribing or "dispensing" controlled substances and imposes civil penalties for violations of these rules.

19.   The CSA prohibits any person from "dispens[ing] a controlled substance in violation of section 829." 21 U.S.C. § 842(a)(1). Under the CSA, any person who prescribes a controlled substance "dispenses" the controlled substance. 21 U.S.C. §§ 802(10) & (21).

20.   Under 21 U.S.C. § 829, Schedule II controlled substances cannot be dispensed without the written prescription of a medical practitioner, except in emergencies or when dispensed directly. 21 U.S.C. § 829(a).

21.   The rules governing the issuance of prescriptions in compliance with 21 U.S.C. § 829 are set forth in 21 C.F.R. Part 1306. *See* 21 C.F.R. § 1306.01.

22.   Under 21 C.F.R. § 1306.04(a), controlled substance prescriptions must be issued by a medical practitioner acting in the usual course of professional practice and must be issued for a legitimate medical purpose. 21 C.F.R. § 1306.04(a).

23. Under 21 C.F.R. § 1306.05(a), all controlled substance prescriptions must bear the full name and address of the patient, and the drug name, strength, and quantity prescribed to them.

24. Rubinger, as a DEA Registrant, agreed to comply and was obligated to comply with the CSA and the rules governing the dispensing of controlled substances.

25. Any person who violates 21 C.F.R. § 1306.04(a) violates 21 U.S.C. § 829 and thus 21 U.S.C. § 842(a)(1). *See* 21 C.F.R. § 1306.04(a) (anyone issuing an invalid prescription "shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.").

26. Any person who violates 21 U.S.C. § 842(a)(1) is subject to a civil penalty for each violation. 21 U.S.C. § 842(c)(1)(A); 28 C.F.R. § 85.5.

## RUBINGER'S MEDICAL PRACTICE

27. Rubinger is a nurse practitioner who runs a mobile medical practice.

28. Rubinger's practice is highly unorthodox, consisting of her, a personal assistant, and a person who manages billing. No licensed physician supervises Rubinger, and no licensed physician is associated with, or employed by, her practice.

29. From November 1, 2019 through June 17, 2024 (the "Covered Period"), Rubinger traveled from city to city, providing a range of services from intravenous flushes to prescriptions for controlled substances.

30. Almost always, she met customers in non-medical environments, such as hotel rooms, without access to necessary diagnostic tools, proper medical records, or any other infrastructure required to treat chronic pain.

## RUBINGER VIOLATED THE CSA

31. Rubinger violated the CSA's dispensing rules on at least 900 occasions by repeatedly dispensing controlled substances without any legitimate medical purpose. She sold prescriptions for cash, wrote prescriptions in the names of individuals without their knowledge, and issued prescriptions intending that the controlled substances be diverted for illegal use.

32. Until June 17, 2024, when the DEA suspended Rubinger's authorization to dispense controlled substances, Rubinger dispensed hundreds of thousands of pills of controlled substances— primarily Oxycodone, Xanax, and Adderall—to patients in over 20 states, many of whom she had never

met, had never examined, and for whom she kept no medical records.

**A.    Rubinger Sold Illegitimate Prescriptions for Cash**

33.    As part of her standard practice, Rubinger sent her customers price lists for highly addictive drugs, including Schedule II controlled substances, and invited them to order those drugs as if they were items on a menu. While adjusted during the Covered Period, these price lists remained substantially similar to the following example:

> 1. Non-controlled medications, such as antibiotics, birth control, blood pressure pills: $100
>
> 2. Controlled substances, such as Xanax, Valium, Ambien: $150
>
> 3. High alert controlled substances, such as Norco, Percocet, injectables: $200
>
> 4. Ultra high alert controlled substances, such as oxycodone, Adderall, etc: $250
>
> Send Venmo to @jrubinger for the total amount requested: once it's received, the prescription will be sent directly to the pharmacy

34.    Legitimate medical practitioners determine the appropriate treatment based on each patient's specific medical needs. Unlike Rubinger, they do not allow customers to choose their own prescriptions from a list of commonly-abused drugs intended to treat a wide variety of conditions.

35.    Rubinger did not include any caveats when sending her price list to patients. She did not say that she would make an independent medical judgment, nor did she state that she would only prescribe if there was a legitimate medical purpose. Instead, she told her customers that, once she received payment, "the prescription will be sent directly to the pharmacy."

36.    By letting customers choose whatever medications they desired, Rubinger abdicated her professional and legal obligations as a medical practitioner and DEA registrant to prescribe only drugs that were medically necessary and instead placed the medical decision in the hands of her customers.

37.    Rubinger's conduct enabled individuals seeking drugs for non-medical purposes, including abuse and diversion, to access controlled substances without barriers. When given the menu of

1    options, Rubinger's customers almost always chose a treatment that included Oxycodone, a drug known

2    for its high street resale value, its highly addictive nature and potential for abuse, and its euphoric

3    effects, rather than other types of painkillers that are not as commonly abused.

4        38.    The screen shot below exemplifies Rubinger's exchanges with her customers, which were

5    transactional and devoid of medical discussion. A customer, "R.W.", asks Rubinger for a prescription, to

6    which she responds "Sure . . . tell me what you need." The customer requests "Oxycodone" and

7    "Alprazolam," and Rubinger replies "[w]ill send when I get Venmo:"



20        39.    In this transaction, Rubinger prescribed Oxycodone, an opioid, and Alprazolam, a

21   benzodiazepine, without any legitimate medical purpose. In deciding whether to issue this prescription,

22   Rubinger did not examine R.W. and maintained no medical record that might have documented any

23   purported medical problem for which these drugs were appropriately prescribed.

24        40.    The concurrent use of benzodiazepines and opioids significantly increases the risk of

25   overdose due to sedation and respiratory depression. There is no indication that Rubinger warned her

26   customer of these potentially deadly interactions.

27        41.    Rubinger wrote fifteen purported prescriptions to R.W.—all for Percocet (which contains

28   Oxycodone), Alprazolam, or Adderall.

COMPLAINT

42.    Despite receiving training regarding the necessity of maintaining medical records, Rubinger did not maintain medical records for R.W.

43.    Rubinger often sold prescriptions over Telegram Messenger, an encrypted messaging application. For instance, in this exchange, the customer, A.C., informed Rubinger that he "sent Venmo" for "hcg and testosterone," to which Rubinger responded, "Thanks love you're all set ✔."



44.    During this transaction—as in many others—Rubinger unilaterally set her Telegram messages to "self-destruct" within one day so that no record of the transaction would be maintained.

45.    Legitimate medical practitioners do not prescribe controlled substances—especially potentially dangerous or highly-abused drugs like testosterone—over an encrypted messaging service and then unilaterally delete the conversation, depriving the patient of a record of what transpired.

46.    Rubinger wrote 23 purported prescriptions for A.C.—all of them for testosterone.

47.    Despite being trained regarding the necessity of keeping medical records, Rubinger did not maintain medical records for A.C.

COMPLAINT

48.     For some customers, Rubinger charged more for dispensing more pills of the same drug, unlike a legitimate medical provider who typically charges a set fee for each type of medical encounter. For example, Rubinger charged $150 for "qty 60" of Percocet and $200 for "qty 90-150" of Percocet, as demonstrated in the version of Rubinger's price list copied below:



49.     Under this regime, whether Rubinger issued a prescription for additional pills did not depend on whether it was medically required, but instead on whether the customer wanted to pay Rubinger more money to get more pills, as Rubinger explains in the messages below:

50.     These transactions were not isolated instances; they were part of Rubinger's standard practices and procedures throughout the Covered Period.

51.     Rubinger relied on personal assistants who accompanied her nearly everywhere, giving them ample opportunity to observe her conduct while on duty. One of Rubinger's personal assistants, G.W., stated that, based on his observations, Rubinger's typical transaction was consistent with the examples described above.

52.     By selling illegitimate prescriptions in the manner described above, Rubinger violated 21 C.F.R. § 1306.04 because she did not issue them for legitimate medical purposes while acting in the usual course of professional practice.

COMPLAINT

**B.      Rubinger Wrote Sham Prescriptions Using False Names**

53.      During the Covered Period, Rubinger wrote invalid prescriptions in the names of individuals who were not the intended recipients of the prescriptions. She did so to facilitate the diversion of those drugs to others.

54.      In the 273 illustrative cases below—as in the cases of many others—Rubinger wrote invalid prescriptions in the names of her customers' friends and associates. These individuals were not the intended recipients of the prescriptions, did not have an established doctor-patient relationship with Rubinger, and had no legitimate medical need for the drugs being prescribed.

55.      One example of this conduct involved T.D., a customer who asked Rubinger to prescribe him opioids. In November 2019, Rubinger complied, issuing invalid prescriptions not only for him, but also in the names of his spouse, uncle, sister-in-law, mother, and even his barber—all for T.D.'s personal use.

56.      T.D. provided the names of his associates to Rubinger, and most, if not all, of these individuals were unaware that they were being prescribed controlled substances and did not consent to participate in Rubinger's scheme.

57.      K.D., the spouse of T.D., was one of the sham patients Rubinger used to divert large quantities of controlled substances to T.D.

58.      Rubinger never established a bona fide doctor patient relationship with K.D.

59.      When deciding whether to prescribe controlled substances to K.D., Rubinger did not have any direct communication with her, did not conduct any examination of her, did not administer any diagnostic tests, and did not otherwise make any determination that K.D. had any legitimate medical need for the drugs Rubinger was prescribing.

60.      Rubinger failed to create any medical records for K.D., despite being trained regarding the necessity of keeping medical records.

61.      K.D. never authorized Rubinger to write controlled substances prescriptions in her name.

62.      K.D. was unaware Rubinger was using her name to issue prescriptions, let alone in order to provide drugs to K.D.'s spouse, whom K.D. knew was struggling with substance use.

63.      K.D. only discovered Rubinger's conduct by chance. While seeking legitimate medical

treatment from a North Carolina hospital, K.D.'s medical provider told her that he suspected she was malingering to obtain more pain medication, based on her history of opioid prescriptions. At that point, K.D. discovered that Rubinger had misappropriated her identity to divert opioids to K.D.'s spouse.

64.    After discovering Rubinger's misconduct, K.D. found Rubinger's Instagram account and initiated a conversation with her through Instagram's direct message feature.

65.    K.D. told Rubinger that she was dismayed that, in the middle of her own medical emergency, she had discovered that Rubinger had been putting prescriptions in her name and diverting dangerous drugs to her spouse.

66.    In these messages, K.D. expressed concern over the quantity of drugs that Rubinger had prescribed, given that K.D.'s spouse was consuming all of it.

67.    During that exchange, Rubinger wrote that: "I didn't know [T.D.] had not cleared it through you," an admission that Rubinger had issued illegitimate prescriptions that were intended for T.D. in K.D.'s name without obtaining her consent:



68.    Between November 2019 and February 2022, Rubinger issued 23 sham prescriptions to K.D.—all of them for Percocet.

69.    Despite her interaction with K.D., Rubinger continued to use sham patients, including to divert drugs to T.D.

70.    Between November 2, 2019 and March 6, 2024, Rubinger dispensed the following controlled substances (among others) to T.D., including through sham patients:

| Drug Name | Quantity of Pills |
|---|---|
| Methadone | 1860 |
| Norco | 90 |
| Oxycodone | 912 |
| Percocet | 12,890 |
| *Grand Total* | **15,752** |

71.    Another example of Rubinger's use of sham patients is her prescribing to another customer, G.F. On more than 150 different occasions, G.F. sent payments to Rubinger with the initials

of one of his associates in the payment line, often with a hamburger emoji, such as "MW 🍔" or "JK 🍔," an apparent reference to Rubinger's statement to G.F. that she sells prescriptions like "burgers" at McDonald's.

72.     Shortly after each payment from G.F., Rubinger wrote sham prescriptions in the name of the associate whose initials G.F. had designated.

73.     G.F. and one of his associates, P.W., discussed this process over text message. In these conversations, they deliberated about the orders for sham prescriptions that they planned on submitting to Rubinger, treating the prescriptions as if they were products in a catalog rather than legitimate medical treatments.

74.     For instance, G.F. proposed ordering four prescriptions for Methadone, which would cost $150 each, as well as prescriptions for Vicodin and Adderall:

> Ok. So lets do mine, yours, Netty's and Grace for the MDone. It's $150x 4 so that's 600. And I'll add the addys & V to yours and add the addys to Netty's. Let me know if that works for you.

75.     In these conversations, G.F. copied Rubinger's encrypted messages, which Rubinger later destroyed. G.F. then pasted Rubinger's message into his conversations with P.W., thereby relaying Rubinger's statements to P.W., including one where Rubinger agreed to prescribe Oxycodone to ten of G.F.'s associates:

> Ok let me see if I understand..
> There are 10 people. Right now, there are no meds available, for anyone.  I'll let you know when I can get oxycodone dispensed, and then all 10 want it again, correct?
>
> For those interested in an alternative medication, equally strong as oxycodone, but it's a controlled release, so it actually works continuously throughout the day, instead of only for 4-6 hours at a time, I can prescribe that anywhere in NY right now, and it's cheaper, at $150 instead of $250.
>
> For those still interested in 10 mg oxycodone (which is 10 mg Percocet), I can probably still prescribe that as well. Just no higher than 10 mg.

76.     Because G.F. submitted orders over text message as an intermediary for ten sham patients, Rubinger did not even know if the sham patients had in fact requested drugs off her price list, let alone examine them and ensure a legitimate medical purpose for the prescriptions.

77.     Despite being trained regarding the necessity of keeping medical records, Rubinger did

COMPLAINT

not maintain medical records for any of G.F.'s associates.

78.    By dispensing opioids to sham patients without any legitimate medical need, Rubinger abdicated her obligations as a medical provider and facilitated the diversion of dangerous drugs into illicit channels.

79.    For instance, on October 7, 2021, the U.S. Department of Homeland Security executed a search warrant on the New Jersey residence of G.F.'s associate P.W. During the search, they found P.W. to be in possession of the prescription drugs that Rubinger had dispensed, as well as 3,4-Methylenedioxy methamphetamine (MDMA), cocaine, and more than $213,000 in cash, some of which is depicted below:



80.    Shortly after the search, P.W. confessed to engaging in drug offenses and was charged with possession of prescription drugs with intent to distribute.

81.    Even though P.W. had been arrested and had confessed, Rubinger continued to issue sham prescriptions in his name. Of the 47 purported prescriptions she issued to P.W., 27 were issued after P.W. had been arrested—all of them were for Oxycodone.

82.    Rubinger repeated this pattern with multiple groups of customers.

83.    For example, Rubinger transmitted sham prescriptions to five associates of another customer, "E.K." On more than 100 different occasions, E.K. sent funds to Rubinger with the initials of one of his associates in the payment line, such as "KF" or "MK."  In return, Rubinger issued

prescriptions in the name of the designated associates, primarily for Oxycodone and Xanax.

84.    When testifying under oath, G.W., one of Rubinger's personal assistants, stated:

a)    He observed Rubinger telling her customers that she would be willing to write prescriptions for them in the names of their friends or relatives, despite the fact that those individuals were not present during that interaction and were not under Rubinger's care;

b)    He understood that Rubinger did this to avoid putting an excessive number of controlled substances prescriptions in the name of a single individual; and

c)    He witnessed Rubinger advising her customers to take certain precautions to avoid raising red flags when picking up medications for the sham patients at their pharmacy.

85.    Rubinger also used her own employees as sham patients, enabling her to further divert dangerous drugs in violation of the CSA.

86.    For example, Rubinger employed C.W., whose responsibilities included medical billing and collections.

87.    Rubinger issued 20 sham prescriptions to C.W., primarily for Oxycodone, Xanax, and Adderall.

88.    Rubinger did not order any diagnostic tests for C.W. and Rubinger did not maintain medical records for C.W., despite her training regarding the necessity of maintaining medical records.

89.    After Rubinger wrote the first Oxycodone prescription to C.W., C.W. performed online research and decided that she did not want to take Oxycodone. C.W. told Rubinger about this decision shortly thereafter.

90.    Despite knowing that C.W. had refused to consume Oxycodone, Rubinger continued to write invalid Oxycodone prescriptions in C.W.'s name.

91.    Rubinger instructed C.W. to place her unwanted controlled substances in a box and mail them to another individual, P.K., whose name Rubinger did not place on the prescription.

92.    Rubinger made electronic payments to C.W., stating the customer's initials, P.K., in the payment notes.

93.    As instructed, C.W. then mailed the drugs, including Oxycodone, to P.K.

94.    Rubinger was fully aware that C.W.'s prescriptions lacked a legitimate medical purpose

1  because she was instructing C.W. to divert them to P.K., rather than use them as part of a medical

2  treatment.

3       95.     Rubinger's use of sham patients violated 21 C.F.R. § 1306.04 because she did not issue

4  these prescriptions for legitimate medical purposes while acting in the usual course of professional

5  practice.

6       **C.     Rubinger Took Steps to Keep Her Unlawful Prescribing from Detection**

7       96.     Rubinger knew her prescriptions were illegitimate and took steps aimed at avoiding

8  detection of her unlawful acts.

9       97.     Rubinger attended at least one continuing education course focused on the prescribing of

10  Schedule II controlled substances. But instead of using that knowledge to prescribe responsibly, she

11  learned how the DEA monitored registrants' prescribing practices and then exploited that knowledge to

12  circumvent DEA's oversight and further her illegal and dangerous prescribing.

13       98.     Rubinger's efforts to avoid detection were reflected in a document that she created and

14  titled "THE RULES," in which she explained to new customers the methods she used to disguise her

15  unlawful activities as a legitimate medical practice:

16            THE RULES

17            Hi Donnie, thank you.

18            With the extremely dangerous climate right now in this country with the
19            ongoing drug epidemic, I just need you to make sure they know there are
          strict rules they have to follow. If anyone slips up, they're done. No
20            second chances.

21            I am the only person who knows exactly how prescriptions work when it
          comes to DEA surveillance, so there are specific processes I put in place
22            to make sure each patient appears as a legitimate medical patient.

23            For example, no mirror scripts. (Like, ordering Valium and Xanax. Both
          are benzodiazepines, so it's one or the other.)

24            Or another example, patients with no history or minimal history of
25            controlled substance use must be stepped-up to the desired dose. Each
          prescription for controlled substance goes onto a federal database, where
26            the DEA can look up every patient, doctor, pharmacist, date, quantity and
          type of medication. Very tight surveillance.

27            There's a few more parts to the formula I use in order to legitimize the
          situation.

28            Not following my process will result in an automatic red flag on the

COMPLAINT

patient, doctor and pharmacist, and will trigger immediate DEA investigation.

2.  Payment must be received *before* I send the scripts in. Everything is done electronically now, no paper scripts. So just like at McDonald's, you gotta pay for your burger before they hand it to you.

3. Medicine MUST be picked up from the pharmacy, regardless of the cost of the medicine, or if the pharmacist didn't dispense the right quantity, etc. Pharmacists have the final say on all scripts. I have no influence over whether they fill it or not.  I can write for 60 pills, and if they decide to dispense only 30, that's all you get. If patients leave meds at the pharmacy, for example, because they are unhappy with the cost of the drug, it triggers a DEA investigation. Because "why would a patient who is in desperate need of a controlled substance leave it at the pharmacy and not pick it up?"

4. I'm the ultimate gatekeeper. If I decide that someone's request carries too much risk, I'll make a recommendation for an alternative way to do it. They can either accept it, or go somewhere else.

5. Just know that I put these rules in place for a reason: to minimize the attention we attract from the DEA. Those who hold a license know how this works and how to stay out of trouble. If anyone gets too aggressive with their requests, I'll let them know softly, and then if they keep insisting, I'll be a little more firm. But in general, if people don't respect the process and follow the rules, they are cut off. Got it?

99.    Several aspects of "THE RULES" demonstrate that Rubinger was not engaged in legitimate medical practice, for instance:

a)    Real medical practitioners establish bona fide doctor-patient relationships with the individuals under their care. They do not have to "make sure each patient appears as a legitimate medical patient."

b)    Legitimate medical professionals provide genuine medical treatment. They do not need to "legitimize the situation."

c)    Legitimate medical practitioners require payment for patient encounters regardless of whether they determine prescriptions for controlled substances are medically necessary. They do not require payments up-front before prescriptions are issued, like selling burgers at McDonald's.

100.    Rubinger's "Rules" made no mention of any requirement that she would only write prescriptions that served a legitimate medical purpose—instead, she created a system to circumvent that requirement and conceal its violation.

COMPLAINT

101.    In an attempt to hide her misconduct, Rubinger made false statements to the DEA, to which she represented that she was practicing under the supervision of a physician, Dr. R.W.

102.    Despite Rubinger's representations to the contrary, Dr. R.W. did not supervise Rubinger. Dr. R.W. did not know that Rubinger had claimed that he was her supervising physician until the DEA executed an Administrative Inspection Warrant on his medical practice, which Rubinger had falsely asserted was her registered location.

103.    In an attempt to hide her misconduct, Rubinger made false statements on the purported prescriptions that she submitted to pharmacies, likely to make them appear more legitimate.

104.    On her illegitimate prescriptions, Rubinger often wrote that she examined her customers in person every three months, when in reality she had not conducted these examinations.

105.    On her illegitimate prescriptions, Rubinger often stated that she had opioid patient prescriber agreements with her customers, which minimize potential risks associated with opioid therapy. In reality, Rubinger had not taken even minimal steps to minimize the risks of diversion and abuse, let alone enter opioid agreements.

106.    On her illegitimate prescriptions, Rubinger often stated that she was practicing under the supervision of Dr. R.W. But Dr. R.W. had not authorized Rubinger to place his name on the prescriptions, did not know Rubinger was doing so, and had not approved the excessive and dangerous treatments Rubinger prescribed.

### D.    Rubinger's Prescribing Was an Extreme Departure from Professional Practice

107.    Rubinger's practices in prescribing controlled substances were an extreme departure from the standards upheld by legitimate medical professionals.

108.    Legitimate medical practitioners examine patients to assess their overall health and identify any underlying conditions. Rubinger prescribed controlled substances—including powerful opioids like Oxycodone—without conducting patient examinations.

109.    Legitimate medical practitioners diagnose and attempt to treat the patient's underlying medical problem in addition to prescribing opioids. Rubinger prescribed controlled substances without establishing bona fide provider-patient relationships with her sham patients, let alone identifying or addressing any underlying cause of pain.

110.    Legitimate medical practitioners rely on their expertise to tailor treatments to a patient's unique medical needs. Rubinger, by contrast, provided her customers a price list and allowed them to select the drugs they wanted. As a result, customers of various ages, backgrounds, and purported medical conditions frequently received the same peculiar combination of drugs. This treatment consisted of three widely abused drugs—Oxycodone, Adderall, and Xanax—each prescribed for entirely different purpose and each carrying a high resale value. This cocktail is dangerous because these drugs have harmful, potentially fatal interactions. Many of these customers were in their 20s, opioid naïve, and particularly vulnerable to risks of overdose and dependency. Yet, Rubinger sold them this addictive, high-risk cocktail, with no legitimate medical justification.

111.    Legitimate medical practitioners create medical records reflecting their assessments, diagnoses, and treatment plans. These records are critical to coordinate care among multiple medical providers and ensure safe, effective treatments. Although Rubinger knew how to create medical records, she failed to do so.

112.    When prescribing opioids for persistent pain, legitimate medical practitioners enter into Opioid Patient Prescriber Agreements. These agreements outline the risks, benefits, and limitations of treatment. Rubinger including false notes on many of her prescriptions claiming that she had such opioid agreements in place with her patients. In reality, she did not.

113.    When prescribing opioids for persistent pain, legitimate medical practitioners often administer urine drug tests to ensure their patients are consuming their medication as directed, rather than diverting it into illicit channels. Rubinger did not require her patients to take any such tests.

114.    When prescribing opioids for persistent pain, legitimate medical practitioners use their knowledge, training, and experience to assess patients and evaluate the potential risk of abuse. Rubinger made no inquiries into factors indicative of risk of abuse, and as a result, prescribed to drug dealers.

115.    Legitimate medical practitioners take steps to minimize the risks posed by the treatments they prescribe. Rubinger placed prescriptions in the names of sham patients and did not track the overall quantities her customers received. Rubinger had no safeguards to ensure her use of sham patients would not lead to overprescribing. To the contrary, much of her prescribing to sham patients was designed to ensure that the intended individuals could receive more drugs than would otherwise be possible without

the use of false names.

116.    Rubinger issued prescriptions at locations from which she was not authorized to practice. Rubinger was licensed to practice only in New York, Colorado, and California and did not have a multistate license. She nevertheless issued prescriptions to patients around the country, including in Illinois, Kansas, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Pennsylvania, Texas, and Virginia.

117.    Rubinger failed to adhere to rules limiting her scope of practice. Many states restrict nurse practitioners' prescribing of Schedule II drugs. For instance, in California, subject to exceptions inapplicable here, nurse practitioners may prescribe Schedule II drugs only after they satisfy several requirements, including prescribing only under physician supervision pursuant to a standardized algorithm authorized by the physician. *See* Cal. Bus. & Prof. Code, § 2836.1. Rubinger practiced in California but did not have a supervising physician.

118.    Rubinger was fully aware of what was required to make her prescriptions legitimate—the medical examinations that should have been performed, the medical records that should have been kept, and the safeguards against diversion and abuse that should have been used—and she failed to take those steps. That is because Rubinger did not intend to limit her prescribing to only those drugs that had a legitimate medical purpose.

### <u>COUNT I</u>
**Issuance of Prescriptions Without a Legitimate Medical Purpose**

119.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth herein.

120.    Rubinger repeatedly violated 21 U.S.C. §§ 842(a)(1) and 829, and 21 C.F.R. § 1306.04(a), by dispensing controlled substances pursuant to illegitimate prescriptions that were either not issued in the usual course of professional treatment, not issued for a legitimate medical purpose, or both.

121.    From November 1, 2019 until June 24, 2024, Rubinger violated these provisions on at least 900 occasions, with the precise number of violations to be established at trial.

122.    These claims are timely pursuant to the parties' agreements to toll the statute of

limitations from November 1, 2024 until January 9, 2025.

123.    For each violation, Rubinger is liable for a civil penalty. *See* 21 U.S.C. § 842(c)(1)(A); 28 C.F.R. § 85.5.

## COUNT II
### Claim for Injunctive Relief

124.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth herein.

125.    Rubinger repeatedly and flagrantly violated 21 U.S.C. § 842(a)(1) by prescribing controlled substances, including dangerous drugs of abuse, without any legitimate medical basis, many of which she knew would in fact be diverted or abused.

126.    While doing so, Rubinger took steps to conceal her misconduct, including falsifying documents, using fake names, misleading pharmacies, lying about her supervising physician, and crafting "rules" to avoid detection.

127.    Pursuant to 21 U.S.C. § 843(f), an order permanently enjoining Rubinger from dispensing controlled substances is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that judgment be entered in its favor and against Defendant Joan Rubinger as follows:

1)    Imposing civil penalties upon Rubinger in the maximum amount allowed by law;

2)    Enjoining Rubinger from dispensing controlled substances; and

3)    Granting the United States such further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial for all issues so triable in this action.

Respectfully submitted,

Dated:  January 8, 2025                    PHILLIP A. TALBERT
                                          United States Attorney

                                    By:   /s/  Steven Tennyson
                                          STEVEN S. TENNYSON
                                          Assistant United States Attorney

COMPLAINT